[Dkt. Ent. 98]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

RYAN W. McERLEAN,

                    Plaintiff,

          v.                              Civil No. 07-5681 (RMB/JS)

WARDEN GARY MERLINE and ATLANTIC          **OPINION**
COUNTY,

                    Defendants.

APPEARANCES:

Ryan W. McErlean
#840500B/60668
South Woods State Prison
215 Burlington Road South
Bridgeton, New Jersey 08302
      Pro Se Plaintiff

James T. Dugan, Esquire
Atlantic County Department of Law
1333 Atlantic Avenue, 8th Floor
Atlantic City, New Jersey 08401
      Defendants' Counsel

**BUMB**, UNITED STATES DISTRICT JUDGE:

     This matter comes before the Court to adjudicate the

affirmative defense asserted at summary judgment by defendants

Warden Gary Merline and Atlantic County (the "Defendants" or

"County Defendants") that Plaintiff failed to exhaust

1

administrative remedies prior to suit, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).  [Dkt. Ent. 98.] The Court held an evidentiary hearing to resolve this matter on January 19, 2011, at which time all parties had the opportunity to present evidence, testimony, and argument to the Court.  For the reasons discussed below, the Court now grants Defendants' motion for summary judgment, finding that Plaintiff did not properly exhaust his administrative remedies.[1]

## I. BACKGROUND

Because the Court's decision turns upon narrow procedural grounds, it need not recite the underlying facts in great detail. By way of summary, the <u>pro se</u> plaintiff Ryan W. McErlean ("Plaintiff"), formerly an inmate at Atlantic County Justice Facility, brought this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights during his detention at ACJF in 2006, by subjecting him to overcrowded and unsanitary living conditions, exposing him to Methicillin-resistant <u>Staphylococcus aureus</u> ("MRSA"), and subsequently failing to provide him with adequate medical care.

On June 1, 2010, the County Defendants moved for summary

---

[1] The Court notes, <u>infra</u>, that even if Plaintiff did exhaust his administrative remedies with respect to his claims for overcrowding and unsanitary living conditions, those claims do not allege the violation of a "clearly established" right, so they must be dismissed under the second prong of the <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), qualified immunity analysis.

judgment on all of Plaintiff's claims.  They asserted several
arguments, including Plaintiff's failure to exhaust his
administrative remedies, a threshold issue.  In an Opinion on
December 7, 2010, this Court denied the County Defendants' motion
without prejudice, finding that a factual dispute regarding
Plaintiff's exhaustion precluded summary judgment.  [Dkt. Ent.
113, 2010 WL 5071328 (the "Opinion").]  Specifically, the Court
noted that the Defendants had failed to rebut or even file a
reply responding to Plaintiff's sworn allegations that his
grievances had been wrongfully withheld by Defendants.  The Court
concluded that this factual dispute necessitated an evidentiary
hearing on the matter.  See, e.g., Richardson v. Goord, 347 F.3d
431 (2d Cir. 2003) (remanding case to determine factual issue
concerning exhaustion where plaintiff testified he had written a
letter to defendant state corrections commissioner complaining of
medical treatment but letter was missing from his cell).[2]
Accordingly, the Court conducted an evidentiary hearing on

---

[2] According to the Court's research, the Fifth, Seventh, and Eleventh Circuits
have held that district courts should resolve fact disputes about procedural
exhaustion at a pre-trial evidentiary hearing.  See Dillon v. Rogers, 596 F.3d
260, 272 (5th Cir. 2010); Pavey v. Conley, 544 F.3d 739, 742 (7th Cir. 2008),
cert. denied, 129 S. Ct. 1620 (2009); Bryant v. Rich, 530 F.3d 1368, 1373-75
(11th Cir. 2008), cert. denied, 129 S. Ct. 733 (2008).  Each of these courts
has held that district judges may resolve fact disputes necessary to
determining whether a plaintiff has exhausted.  Although the Third Circuit has
not squarely addressed this issue, it has issued a precedential opinion in
Drippe v. Tobelinski, 604 F.3d 778 (3d Cir. 2010), in which it signaled its
agreement with the Seventh Circuit case Pavey v. Conley, 544 F.3d 739, 740
(7th Cir. 2008), that "exhaustion of administrative remedies under the PLRA is
a question of law to be determined by the judge . . . ."  Drippe, 604 F.3d at
782.

January 19, 2011, to resolve the issue of Plaintiff's administrative exhaustion.

## II. LEGAL STANDARD

### A. Standard of Review

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id. at 250.

When deciding the existence of a genuine dispute of material fact, a court's role is - typically - not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). Here, however, where the Court has conducted an evidentiary hearing on the issue of exhaustion, it may determine such issues of fact and credibility. See, supra, n.2.

---

[3] Amendments to the Federal Rules of Civil Procedure became effective on December 1, 2010. The oft-cited summary judgment standard is now located in Rule 56(a) rather than Rule 56(c). Although the wording of the standard has changed slightly, replacing the word "issue" with "dispute" ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact"), this change does not affect the substantive standard or the applicability of prior decisions construing the standard. Fed. R. Civ. P. 56(a) advisory committee's note (emphasis added).

However, "a mere scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  <u>Anderson</u>, 477 U.S. at 249.  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587 (1986).  "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'"  <u>Williams v. Borough of West Chester, Pa.</u>, 891 F.2d 458, 460 (3d Cir. 1989) (quoting <u>Anderson</u>, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson</u>, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The non-movant's burden is rigorous: it "must point to concrete

evidence in the record"; mere allegations, conclusions,

conjecture, and speculation will not defeat summary judgment.

Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir.

1995).

**B. Prison Litigation Reform Act**

The Prison Litigation Reform Act ("PLRA") requires a

prisoner asserting a § 1983 claim regarding prison conditions to

first exhaust his administrative remedies before filing suit.

See Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000).  The PLRA

provides as follows:

> No action shall be brought with respect to prison
> conditions under section 1983 of this title, or any
> other Federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. 1997e(a).  The failure to exhaust is an affirmative

defense, see Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002),

that the defendant must plead and prove by a preponderance of the

evidence.  See Baker v. Brown, No. 04-cv-4966, 2007 WL 835431, *4

(D.N.J. Mar. 13, 2007) (citing Cardenas v. Massey, 269 F.3d 251,

266 (3d Cir. 2001)).

A prisoner has not exhausted all of his administrative

remedies until he has "pursued a grievance through each level of

appeal available within the prison system."  Worthy v. Dep't of

Corrections, No. 05-cv-751, 2006 WL 2376916, *3 (D.N.J. Aug. 16,

6

2006) (citing <u>Spruill v. Gillis</u>, 372 F.3d 218, 232 (3d Cir. 2004)).  Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  <u>See</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 90-91 (2006).

Importantly, the Third Circuit does not recognize a futility exception to the PLRA's exhaustion requirement; thus, a prisoner must still exhaust, even where the administrative remedy may be ineffective.  <u>Nyhuis v. Reno</u>, 204 F.3d 65, 71-72 (3d Cir. 2000). However, a prisoner may satisfy the exhaustion requirement where he substantially complies with the administrative remedy scheme. <u>Nyhuis</u>, 204 F.3d at 77-78 ("Without embellishing-for the case law in the area will have to develop-we note our understanding that compliance with the administrative remedy scheme will be satisfactory if it is substantial.") (internal citations omitted).  Although the Third Circuit has not fully explored the meaning of "substantial compliance," it has suggested that where a prisoner has shown no evidence that the prison's administrative remedy was unavailable, he cannot invoke this exception to the general rule requiring proper exhaustion.  <u>See, e.g.</u>, <u>Oliver v. Moore</u>, 145 Fed. Appx. 731, 734 (3d Cir. 2005) (plaintiff's letters to prison officials did not constitute substantial

compliance with administrative remedy scheme "because there is no evidence that the prison's administrative remedy was not available").

After considering the testimony, evidence, and arguments presented at the evidentiary hearing, and after assessing the credibility of the witnesses, the Court makes the following findings of fact and conclusions of law.

## III. FINDINGS OF FACT[4]

1.  Plaintiff was a prisoner incarcerated at the Ocean County Jail in Toms River, New Jersey, at the time he filed the Complaint. [Dkt. Ent. 1 at 4.]

2.  Plaintiff's Second Amended Complaint ("Complaint") raises various claims under 42 U.S.C. § 1983 for alleged violations of constitutional rights. [Dkt. Ent. 51.] Specifically, Plaintiff alleges that during his incarceration at Atlantic County Justice Facility ("ACJF") between February and November 2006, he was exposed to unsanitary and overcrowded conditions, which caused him to contract MRSA.

3.  It is undisputed that Plaintiff was aware of the administrative remedies available to him at ACJF. He received a copy of the Gerald L. Gormley Justice Facility Inmate Handbook ("Inmate Handbook") upon his admission

---

[4] All findings of fact are undisputed unless otherwise specified.

there.  (Defs.' Hr'g Ex. 9, McErlean Dep. 100:13-15, Dec.
21, 2009 ("McErlean Dep.").)

4.  The Inmate Handbook sets forth a two-tier grievance
    procedure, requiring a prisoner to first file an informal
    grievance and then, if necessary, a formal grievance.  The
    Inmate Handbook states in relevant part:

> All grievances are to be first handled <u>informally</u>
> through the chain of command (i.e.: Counselor or
> Officer, Sergeant, Lieutenant/Shift Commander) via an
> inmate request form.  After all attempts to handle the
> matter informally are exhausted, and still not to the
> mutual agreement of all involved, the matter can then
> be <u>formally</u> grieved to the Warden/Director's office.  A
> formal grievance shall be filed only using grievance
> form #1.20.09 #2 (copy included in the handbook) and
> available from your housing unit officer.

(Defs.' Hr'g Ex. 2 (emphasis added).)

5.  Although Plaintiff complains that his grievances went
    "unanswered," he has never alleged that the defendants or
    any other prison officials prevented him from using the
    administrative remedy procedure described in the Inmate
    Handbook.  (Evid. Hr'g Tr. 58:8-10, Jan. 19, 2011
    (hereinafter "Tr.").)

6.  In fact, Plaintiff alleges that he "filed <u>multiple</u>
    grievances as to overcrowding, unsanitary conditions, vermin
    and infestations, failure to isolate inmates with infections
    [<u>sic</u>] diseases [and] failure to provide full legal access."
    (Compl. ¶ 44 (emphasis added).)  Plaintiff has not submitted

9

copies to the Court of any of these grievances that he allegedly filed.  He maintains that he did not keep copies of them and that the Defendants either lost, misfiled, or discarded them.  (See Pl.'s Opp. Br. "Point II" ("Plaintiffs many missing grievances may have been misfiled or may have been thrown away for some 'Clerical Error' . . . .").)

7.   The Defendants did not file a reply brief disputing Plaintiff's suggestion that they had lost, misfiled, or discarded the relevant grievances.  However, Defendants argued in their moving papers that Plaintiff had filed "numerous" inmate request forms - i.e. informal grievances - as well as one formal grievance, but that none of these grievances related to the claims at issue here.  (Defs.' Moving Br. 8.)  Significantly, in their summary judgment papers, Defendants submitted the formal grievance but not the "numerous" informal grievances, so the Court could not assess for itself whether these informal grievances raised claims relevant to the Complaint.  The Court held an evidentiary hearing on January 19, 2011, to resolve this factual dispute.

8.   At the evidentiary hearing, Defendants presented the testimony of Lieutenant Myron Hendrick, who is the Lieutenant Commander of Classifications and oversees all

record-keeping for ACJF.  (Tr. 7:23-8:11.)  He testified

that a prisoner's classification file is kept in the

ordinary course of business at ACJF and contains all

original, inmate request forms, along with any responses

from the prison administration.  (Tr. 15:25-16:3; 15:7-16.)

He testified that to his knowledge, neither he nor any other

officer had ever removed or intentionally not filed

documents that should have gone into an inmate's file, and

further, that such conduct would subject an officer to

disciplinary measures.  (Tr. 14:7-13, 15:17-24.)  Lieutenant

Hendrick also testified that Defendants' Exhibit 5 at the

evidentiary hearing constitutes all of the inmate request

forms contained in Plaintiff's file at ACJF.  (Tr. 17:16-

21.)

9.   According to the Court's calculation, Defendants' Exhibit 5

consists of 43 individual inmate request forms (two of which

are letters from Plaintiff to Defendant Warden Merline), two

inter-office memos from prison officers to Plaintiff, and a

notice informing Plaintiff that prison officials would

dispose of certain unauthorized mail.[5]  (Defs.' Hr'g Ex. 5.)

---

[5] The Court notes that defense counsel mistakenly stated that there were 47
inmate request forms.  (Tr. 18:14-18, 66:11-14.)  Nevertheless, the Court
finds credible Lieutenant Hendrick's testimony that Plaintiff's file is
complete.  In any case, the number of inmate request forms is irrelevant for
the purposes of determining Plaintiff's administrative exhaustion, given the
lack of formal grievances in his file.  Further, the Court analyzes the only
two claims that could possibly have been exhausted based on Plaintiff's letter
to Warden Merline (for overcrowding and unsanitary conditions).  See, infra,

Significantly, Plaintiff conceded that all of these informal request forms complained of issues completely unrelated to the claims alleged in the Complaint.  (Tr. 21:1-4.)

10. Lieutenant Hendrick also testified that Plaintiff McErlean only had one formal grievance in his file.  (Tr. 21:20-22:7, 23:22-24:1.)  It asserts the following grievance:

> "We have social worker 'stuff' (remits, property form)[.] [W]e need forms for bail reductions ect [sic]...  We have not received West Law or request responses in 1 month or more."

(Defs.' Hr'g Ex. 6 (ellipses in original).)  The grievance form then asks, "What steps have you taken to resolve this matter or complaint?"  Plaintiff's written response states, "Repeated requests to staff."  The form finally asks, "Action or relief requested?"  Plaintiff's written response states, "We need a social worker or paraleagle [sic] A.S.A.P."  Although this grievance concerns a request for bail forms and West Law materials and thus clearly does not come within the ambit of the claims at issue here, Plaintiff argues that this grievance should be read broadly.  He asserts that the Court should not read it in the context of asking for bail forms or West Law materials but as grieving ACJF's failure to respond to any of his previous inmate request forms about any subject matter.  (Tr. 39:1-13.)  The

---

"Substantial Compliance" and "Qualified Immunity."

Court finds this argument unpersuasive and irrelevant,
because there is no indication that this formal grievance
relates to any of the claims at issue here or that it
complains of ACJF's failure to respond to informal
grievances concerning the relevant claims.

11.  Thus, neither party has submitted to the Court any informal
or formal grievances filed by Plaintiff that relate to the
claims raised in the Complaint.

12.  In Plaintiff's opposition papers, he alleged that he spoke
with a prison social worker, Tamika Farmer, about the fact
that his grievances were going unanswered, and that Ms.
Farmer directed him to write a letter to Warden Merline,
which Plaintiff did.  (See Pl.'s Opp. Br. "Point II.")  The
Court notes that Plaintiff never specified that these
unanswered grievances related to the claims at issue here.
In any case, Farmer testified that she did not recall having
a conversation with Plaintiff about unanswered requests and
grievances, (Tr. 50:25-51:4), but that if a prisoner had
asked her what to do in a situation where the warden was not
responding to the prisoner's grievances, she would have
recommended that the prisoner continue to file such
grievances.  (Tr. 52:23-53:2.)

13.  Plaintiff sent an undated letter (the "Letter") to Defendant

13

Warden Merline during his incarceration at ACJF. (Defs.'
Hr'g Ex. 7; Defs.' SJ Ex. E.)[6] In that letter, Plaintiff
raised several issues, two of which are relevant for
purposes of this motion. First, Plaintiff complained of
overcrowding that forced him and his fellow inmates to eat
in their rooms on the floor next to their toilets. He
suggested that the jail benefited financially from this
overcrowding. Second, Plaintiff complained of bubbled
rhino-coating, poor ventilation, and moldy conditions in the
bathrooms.[7]

14. Defendant Warden Merline responded to Plaintiff's letter in
a letter dated October 16, 2006. (Defs.' Hr'g Ex. 7 at 3.)
His response states in relevant part:

> 4. They [sic] inmate areas are crowded. The
> facility makes no monies from county inmates. The

_____

[6] The Court notes that the copy of this letter submitted by Defendants at the
evidentiary hearing omits the last four lines of the first page. Thus, the
Court refers to the complete copy of this letter, which Defendants submitted
with their summary judgment moving papers as Exhibit E.
[7] Plaintiff's letter states in relevant part:
> #4) We typically have 70 inmates where there should be 32 - whatever -
> this is a booming business. People are making big money from this and
> bottom line is if most of us kept our nose clean we would not have to
> deal with this. But we are forced to eat in our rooms on the floor
> next to our toilets.
> #5) Our bathrooms are so bad in A-Right. The downstairs one, all the
> "rhino coating" is bubbled up, floor and ceiling, mold growing under
> it - the vents are painted or coated over upstairs which does not
> allow them to ever dry out and the moisture goes down to lower
> bathroom and the conditions are extreme. Officer Dutra brought bleach
> last week and inspected. If we could in least [sic] remove ruined
> floor to spray and clean mold . . . but no one can make a decision. I
> have several guys that are willing to do the work. We just need o.k.

(Defs.' SJ Ex. E.)

> State inmates that are here are pending removal and we
> work each week to get as many as we can out, if not all
> (if the state could take them).  There is no plan to
> keep any inmate here for any period of time to make
> money off of them.
>     5. We are aware of the bathroom issue and will
> addressing [sic] your area shortly.  The bathroom
> linings will be addressed, as we have already started
> other areas.

(Id.)

15.  Plaintiff admits that towards the end of his time at ACJF,

the prison completed some work on the bathrooms, removing

the lining from the walls, painting, and attempting to

unclog the drains.  (McErlean Dep. 121:23-122:6.)[8]

**Evidentiary Hearing: Credibility Assessments**

16.  After assessing Plaintiff's credibility at the evidentiary

hearing and reviewing all evidence, testimony, and argument,

the Court finds not credible Plaintiff's bare assertion that

he filed multiple grievances concerning the claims at issue

here and that Defendants somehow lost, misfiled, or

discarded them.  Plaintiff's testimony was inconsistent on

several occasions.  First, Plaintiff testified that he had

filed "at least ten" formal grievances regarding

---

[8] Plaintiff's deposition transcript states in relevant part:
    Q: While you were there [at ACJF], was work being done on the bathrooms?
    A: After nine months of being there, one bathroom, and they finally come
    in and ripped down the lining and put some paint on it, but never, the
    drain was never unclogged, and I mean there was an attempt made, but it
    never, you know.  I mean it could never even get up to the 70 people
    using, you know."
(McErlean Dep. 121:23-122:6.)

overcrowding,[9] but later testified that he had filed only
<u>three</u> formal grievances.[10]   Second, although Plaintiff now
maintains that he filed three formal grievances, he also
stated at the evidentiary hearing that he was unsure of
which grievances he had filed personally and which had been
filed by other inmates, because the filing of grievances had
been a joint endeavor at ACJF.   (Tr. 68:2-23 ("[A]s you
know, the five years have passed, there has been a certain
amount of well, did I write this [grievance] or did this guy
write this one? . . . But at this stage . . . it's hard to
limit down exactly, you know, who did which [grievance]."").)
Third, Plaintiff testified that Farmer had directed him to
send a letter to the warden via first class mail, but when
questioned about this later, he changed his statement,
asserting that Farmer had not suggested it but that he had
proposed the idea.[11]

---

[9] Plaintiff's deposition transcript states in relevant part:
    Q: My question is you, did you file inmate request forms –
    A: Absolutely.
    Q: – concerning overcrowding?
    A: Absolutely.  At least ten of them.
    Q: You filed ten inmate request forms concerning overcrowding?
    A: At least.  And then at least ten grievances, too.
    (McErlean Dep. 105:12-20.)
[10] The evidentiary hearing transcript states in relevant part:
    Q: Your sworn testimony here is you filed three grievances, correct?
    A (Plaintiff McErlean): Yes.
(Tr. 63:5-7.)
[11] The evidentiary hearing transcript reads in relevant part:
    THE COURT: What did [social worker Tamika Farmer] say to you?
    MR. McERLEAN: She said to, you know, keep filing them, and advised me I
    could write the warden and send it through the United States mail so it
    would definitely make it to him.

17. Farmer's testimony raises further doubts as to the veracity of Plaintiff's assertions that he filed multiple grievances. She testified that although she did not remember any particular conversation with Plaintiff, she would have advised him to continue filing grievances, even if they were going unanswered. (Tr. 52:23-53:2.)  Yet, the lack of formal grievances in Plaintiff's file indicates that he did not continue to file them. (See Defs.' Hr'g Ex. 8, Bondiskey Aff. ¶¶ 15-16) ("Despite inmate McErlean's claim of having filed 'multiple' grievances, the only grievance in McErlean's file is the grievance concerning WestLaw production of forms.")

18. Although Defendants did not initially rebut Plaintiff's assertions that Defendants had misfiled, lost, or discarded Plaintiff's purportedly "missing" grievances (by failing to file a reply in response to Plaintiff's opposition papers),

---

. . .
THE COURT: Is it your testimony that Ms. Farmer told you to file a grievance through the United States Mail or did you take it upon yourself to file it through the United States Mail?  I'm not clear on your testimony.
MR. McERLEAN: Well, I'm trying to remember exactly, but when I questioned her about these grievances going unanswered she said, you know, try filing other grievances.  And I said well, like, I did that. And I don't know if I even suggested what about sending a letter to the warden through the mail?  And she said that could be a good idea.  I'm not sure exactly how that transpired because I was basically bouncing thing [sic] off her trying to get a result.
(Tr. 61:20-24, 62:16-63:2.)

17

Defendants presented sufficient evidence at the evidentiary hearing to rebut these charges.  Lieutenant Hendrick testified that all of the informal and formal grievances in Plaintiff's file have been presented to the Court (as Exhibits 5 and 6, respectively), that neither he nor any other officer had ever removed or intentionally not filed documents that should have gone into an inmate's file, and that such conduct would subject an officer to disciplinary measures.  (Tr. 14:7-13, 15:17-24.)  Further, Defendants produced the 43 informal grievances that they had not submitted with their summary judgment papers, and Plaintiff conceded that none of them raised the matters at issue here.

19. Accordingly, given Plaintiff's lack of credibility as well as the evidence presented by Defendants at the evidentiary hearing, the Court is satisfied that the record is complete and that Plaintiff only filed grievances (both informal and formal) regarding matters unrelated to the Complaint.

**IV. CONCLUSIONS OF LAW**

1. The Court finds that based on the evidence and testimony presented at the evidentiary hearing, it is clear that no genuine dispute of material fact exists with respect to Plaintiff's exhaustion.  "[F]or the exhaustion requirement to be satisfied, the inmate must utilize <u>all available</u>

18

procedures for review under the prison's grievance system."

Harvey v. Brown, No. 06-cv-1891, 2010 WL 338052, *2 (D.N.J.

Jan. 25, 2010) (emphasis in original) (citing Michael B.

Mushlin, Rights of Prisoners § 17:22 at 615 (4th ed. 2009)).

The record shows that Plaintiff did not exhaust the informal

or formal procedures for the claims at issue in this

litigation.  In fact, none of the grievances produced in

this case grieve matters related to the claims alleged in

the Complaint.

**Substantial Compliance**

2.    However, the Court's finding that Plaintiff failed to

properly grieve the claims at issue does not end the

exhaustion inquiry.  The Court notes that Plaintiff's

undated letter to the Warden (the "Letter") - which

complains of overcrowding and unsanitary living conditions -

raises the issue of whether Plaintiff has substantially

complied with the ACJF's grievance procedure sufficient to

satisfy the demands of the PLRA.[12]

3.    As an initial matter, the Court considers whether the Letter

raises the same claims asserted in the Complaint.  The

---

[12] Although Plaintiff has not expressly argued "substantial compliance," the
Court is mindful of the general notion that pro se filings are held to a less
stringent standard than filings made with the benefit of a lawyer.  Cf. Haines
v. Kerner, 404 U.S. 519, 520-21 (1972) (holding a pro se complaint "to less
stringent standards than formal pleadings drafted by lawyers").  Thus, in an
abundance of caution, the Court considers the issue of substantial compliance.

Letter complains of (1) severe overcrowding that forced Plaintiff and his fellow inmates to eat in their rooms on the floor next to their toilets, and (2) bubbled rhino coating, poor ventilation, and moldy conditions in the bathrooms. (Defs.' SJ Ex. E.) The "Facts" section of the Complaint alleges "extremely unsanitary" and "overcrowded" conditions, such that Plaintiff was forced to "eat on the floor sitting on his mattress." (Compl. ¶ 24-27.) The Complaint also alleges that "the totality of the conditions described in paragraphs 13 through 49 [the "Facts" section] amount to cruel and unusual punishment" in violation of the Eighth Amendment.[13] Construing the <u>pro se</u> Complaint liberally, as it must, <u>see</u> <u>Haines</u>, 404 U.S. at 520-21, the Court recognizes two Fourteenth Amendment claims for overcrowding and unsanitary conditions.

4.   Significantly, it appears that the Letter only satisfies the informal grievance procedure. Lieutenant Hendrick testified that letters may be construed as informal grievances under the ACJF's grievance system. (Tr. 44:5-16.) Thus, assuming the Letter constitutes an informal grievance, as Defendants have conceded, Plaintiff has still failed to satisfy the

---

[13] In its December 7, 2010 Opinion, this Court noted that it construes Plaintiff's alleged Eighth Amendment violations as Due Process violations under the Fourteenth Amendment, since Plaintiff was a pretrial detainee at the time of the alleged harm. Opinion, 2010 WL 5071328, *1 n.3.

second, _formal_, step of the two-tier grievance procedure.

5.    Plaintiff argues that the Letter includes an "accompanying
      request form" concerning the issue of overcrowding.[14]  (Tr.
      39:16-20.)  However, even if the attached request form could
      satisfy the informal grievance requirement, that fact is
      irrelevant, because the Letter already satisfies this
      informal step.  Further, Plaintiff McErlean could not have
      simultaneously satisfied both the informal and formal
      grievance procedures with this single Letter and purported
      attachment.  Such a result would contravene the purpose of
      the administrative remedy scheme, which is to provide the
      prison with an opportunity to informally remedy the problem
      first.  The Inmate Handbook provides that inmates should
      formally grieve a matter only "[a]fter all attempts to
      handle the matter informally are exhausted, and still not to
      the mutual agreement of all involved." (Defs.' Hr'g Ex. 2.)
      Thus, Plaintiff could not simultaneously file both informal
      and formal grievances.

6.    Further, the Court is wary of permitting an exception to the
      mandatory requirement of proper exhaustion where there is no

---

[14] The parties agree that the Letter in Plaintiff's classification file and
submitted to the Court does not include an attachment.  However, the Letter
does refer to an attachment, stating that the lack of a law library "hinders
our defence [sic] and adds to the overcrowding [sic] conditions here in A-
Right. *See _Accompanying Request Form.*_" (Defs.' SJ Ex. E (emphasis in
original).)

21

evidence that the prison's administrative remedy was
unavailable to Plaintiff.  See Oliver, 145 Fed. Appx. at
734-35 (plaintiff's letter/complaints did not constitute
substantial compliance with the prison's grievance
procedures where there was "no evidence that the prison's
administrative remedy was not available").  Plaintiff has
never alleged that prison officials prevented him from
participating in ACJF's grievance process.  In fact,
Defendants have put forth considerable evidence to the
contrary, submitting to the Court Plaintiff's 43 informal
grievances and one formal grievance.  Furthermore, the Court
is mindful that to function effectively, a prison's
adjudicative system must "impos[e] some orderly structure on
the course of its proceedings."  See Woodford v. Ngo, 548
U.S. 81, 90-91 (2006).  If a prisoner could circumvent the
grievance procedure by merely sending a letter to the
warden, even where the ordinary remedy procedure was
available to him, that would render the grievance procedure
meaningless and cause prisoners to always circumvent the
rules.

7.   Accordingly, after careful consideration of the evidence,
     testimony, and argument on the matter, the Court finds that
     the Defendants have satisfied their burden of showing that

Plaintiff failed to administratively exhaust any of his claims before initiating this action.

**_Qualified Immunity_**

8. In an abundance of caution, the Court notes that even if Plaintiff's Letter and missing attachment had constituted substantial compliance with the grievance procedure, the Defendants' qualified immunity defense necessitates dismissal of these claims anyway.  Plaintiff's claims for overcrowding and unsanitary conditions easily fail under the second prong of the two-step qualified immunity analysis under <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), because Plaintiff has not alleged the violation of a right that was clearly established at the time of Defendants' alleged misconduct.

9. Plaintiff has brought this action against Defendants pursuant to 42 U.S.C. § 1983.  Notwithstanding Section 1983's imposition of liability to "[e]very person,"[15] courts have limited its application according to common-law immunities recognized at the time of its 1871 enactment. <u>Burns v. Reed</u>, 500 U.S. 478, 484 (1991) (citing <u>Pierson v.</u>

---

[15] Section 1983 of Title 42 of the United States Code provides:
        Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

<u>Ray</u>, 386 U.S. 547, 554 (1967)).  Specifically, courts have applied two kinds of immunities in § 1983 actions: qualified immunity and absolute immunity.  <u>Yarris v. County of Delaware</u>, 465 F.3d 129, 135 (3d Cir. 2006).

10. Defendants seek summary judgment on the ground that they are protected by qualified immunity, which shields officials from suit for their objectively reasonable conduct.  <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808, 815 (2009).  The doctrine operates "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).  Thus, qualified immunity protects officials when they may have acted upon reasonable errors, whether mistakes of law or fact.  <u>Pearson</u>, 129 S. Ct. at 815.

11. The Supreme Court has suggested a two-step inquiry to determine whether a defendant-official is entitled to the protection of qualified immunity: "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." <u>Id.</u> at 815-16 (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201

(2001)).  When conducting this inquiry on summary judgment, courts must view all facts and reasonable inferences in the light most favorable to the plaintiff.  <u>See</u> <u>Giles v. Kearney</u>, 571 F.3d 318, 326 (3d Cir. 2009).  Since the sequence of the two-step inquiry is no longer mandatory, the Court turns first to whether the right at issue was "clearly established" at the time of the alleged violation.  <u>Pearson</u>, 129 S. Ct. at 815-16.

12.  Specifically, Plaintiff complains that there were "70 inmates where there should be 32," and that due to this over-crowding, he was forced to eat next to the toilet. (Defs.' SJ Ex. E.)  He also complains of "bubbled up" rhino coating, poor ventilation, and mold in the bathroom, although he admits that the prison took measures to rectify these problems.  (<u>See</u> <u>id.</u>; McErlean Dep. 121:23-122:6.)

13.  "A right is clearly established for purposes of qualified immunity when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Hubbard v. Taylor</u>, 538 F.3d 229, 236 (3d Cir. 2008) (citing <u>Williams v. Bitner</u>, 455 F.3d 186, 191 (3d Cir. 2006) (quoting <u>Saucier</u>, 533 U.S. at 202) (internal quotations omitted).  "Thus, the qualified immunity standard gives ample room for mistaken judgments by

25

protecting all but the plainly incompetent or those who
knowingly violate the law." Hubbard, 538 F.3d at 236
(citing Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005)
(quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

14. The Third Circuit has noted that its own precedent, as well
as that of the Supreme Court, has not clearly established
the degree of prison overcrowding that constitutes
"punishment" under the Fourteenth Amendment. Id. at 236.
In Hubbard, the Third Circuit confronted a similar case to
the one at bar. There, pretrial detainees brought a § 1983
action against prison officials for overcrowding, alleging
that the prison's policy of triple-celling forced them to
sleep on floor mattresses for extended periods of time,
usually between three and seven months while waiting for one
of the bunk beds to become available. Id. at 235. After
analyzing the totality of the circumstances and noting the
"very limited role that courts should play in the
administration of detention facilities," id. at 235 (citing
Block v. Rutherford, 468 U.S. 576, 584 (1984)), the Court
concluded that Plaintiffs had not suffered a due process
deprivation. Further, the Court noted that even if
Plaintiff had established a constitutional violation, the
right at issue was certainly not "clearly established,"

26

given the jurisprudence in this area: "our own precedents have never established a right of pretrial detainees to be free from triple-celling or from sleeping on a mattress placed on the floor." Id. at 236.  Similarly, Plaintiff McErlean did not possess a clearly established right to be free from crowded cells or from sleeping and eating on a floor mattress near the toilet.[16]  Indeed, Plaintiff has not contested this point in his opposition papers.

15. Plaintiff's unsanitary conditions claim fails for the same reasons.  As an initial matter, the Court notes that Plaintiff McErlean never presented any evidence that the mold and bubbled-up rhino coating in the bathroom amounted to punishment under the Fourteenth Amendment.  See Tapp v. Proto, No. 10-cv-3059, 2010 WL 5095832, *2 (3d Cir. Dec. 13, 2010) (affirming summary judgment of condition of confinement claims where plaintiff "presented no evidence that the conditions he experienced [during pretrial detention] amounted to the type of genuine privation that qualifies as 'punishment'").  In fact, Plaintiff even admits

---

[16] The Court notes that Plaintiff did not provide any details on the alleged overcrowding or explain how this constituted "punishment" under the Fourteenth Amendment.  (In fact, Warden Merline's letter suggests that ACJF staff were doing their best to reduce the prison population: "The State inmates that are here are pending removal and we work each week to get as many as we can out, if not all (if the state could take them)."  (Defs.' Hr'g Ex. 7 at 3.)) Plaintiff merely states that there were 70 inmates for facilities designed for 32, but he does not specify the number of inmates confined to each cell, the dimensions of the cell, or the availability of common area space.

that the prison staff responded to his request and made
efforts to rectify the problem both before and after
receiving his Letter.  (Defs.' SJ Ex. E (noting that an
officer had previously brought bleach to the inmates);
McErlean Dep. 121:23-122:6 (noting that prison staff later
removed the lining from the walls, painted, and attempted to
unclog the drains)).

16. Furthermore, it is clear that Plaintiff's unsanitary
conditions claim fails under the second <u>Saucier</u> prong.
Plaintiff did not have a "clearly established" right to a
bathroom without mold, bubbled rhino coating, and poor
ventilation.  In <u>Keller v. County of Bucks</u>, the Third
Circuit affirmed a jury verdict in plaintiff's favor where
the prison facility had much more extreme problems, which
led to the plaintiffs' MRSA infections – <u>i.e.</u>, a lack of
proper ventilation, a roof in disrepair, water pooling in
showers and seeping into cells, stained mattresses, and
mildew growing on walls covered in peeling paint.  209 Fed.
Appx. 201, 206 (3d Cir. 2006).  There, the Court affirmed a
jury verdict, concluding that although it did not find the
evidence as persuasive as the jury did, the great weight of
the evidence did not cut against the verdict.  <u>Id.</u>  However,
the Court concluded that even these "distasteful" conditions

"barely fulfill[ed] the minimum requirements of a conditions
of confinement claim."  <u>Id.</u> at 207.  The Court "caution[ed]
that situations of even <u>slightly</u> lesser magnitude would
likely be an abuse of discretion as a result of improper
application of law to fact."  <u>See id.</u> (internal citations
omitted) (emphasis added).  Thus, Plaintiff's allegation
that the bathroom was moldy, poorly ventilated, and had
bubbled rhino coating, falls far short of asserting the
violation of a "clearly established" right.

**V.  CONCLUSION**

For the foregoing reasons, the Court grants the Defendants'
motion for summary judgment on all counts.  An appropriate Order
shall issue this date.


Dated: <u>February 8, 2011</u>           <u>s/Renée Marie Bumb</u>
                                   RENÉE MARIE BUMB
                                   United States District Judge